REMO ENGINEERING CORPORATION, Appellant, Respondent, *v.* THE CITY OF NEW YORK, Respondent, Appellant.

First Department, November 22, 1940.

*Emil V. Pilz* of counsel [*Asa B. Kellogg* with him on the brief; *Nevius, Brett & Kellogg,* attorneys], for the appellant-respondent.

*John G. Clancy* of counsel [*Paxton Blair* with him on the brief; *William C. Chanler, Corporation Counsel*], for the respondent-appellant.

O'MALLEY, J.  The question presented is whether the defendant city may be held liable under a sealed contract between the parties, or whether the plaintiff contractor must look to the State of New York for any relief to which it may be entitled.

Under the terms of the New York City Grade Crossing Elimination Act (Laws of 1928, chap. 677), the city decided to accept State aid and to do the work itself.  In addition to the purely elimination features, the city, as part of the plan, awarded plaintiff a contract for the construction of certain sewers.  As already noted, this contract was under seal and signed on behalf of the city by the acting president of the borough of Manhattan.

The city, however, disclaims liability under the contract for the reason, among others, that the act in question provides that the cost of the work is to be apportioned fifty per cent to the railroad, forty-nine per cent to the State and one per cent to the city, and that in the particular circumstances, it was acting as the agent of the State.

In these respects it is to be noted that the proportionate shares above referred to are to be computed upon completion of the work and that the act itself contains no provision to the effect that, where the railroad or the municipality undertakes the work, a contractor must await completion of the project for payment, or that payments to be made in the course of the work may be required of the State alone — not a party to the agreement.  Nor is there any reference whatever in the contract itself to a relationship of agency.

While it is true that under the statute the obligation to create a fund from which payments might be made rests upon the State, nevertheless, under the contract, as distinguished from the statute, the city is still bound to carry out its part of the agreement.

Indeed, the act (§ 5, subd. 10) provides: " The city is hereby empowered to meet the cost of *public improvements*  *  *  *  and also its share of the cost of carrying out the purely elimination features  *  *  *  by payments from current revenues, or from the street improvement fund, the street and park opening fund, the park improvement fund or other funds, and may issue and sell revenue bonds, tax notes, corporate stock or evidences of indebtedness, as may be determined by the board of estimate and apportionment, and to replenish any of such funds so drawn upon in the manner now provided by law."  (Italics ours.)

This provision clearly indicates that the city in a particular case would be liable for expenditures in the first instance for public improvements as distinguished from purely elimination features.

Here, the form of the contract was approved by the Transit Commission as provided by the statute. Apparently it varies from the usual city contract but in one particular — paragraph LIV. This is to the effect that the provisions for payment by the city of New York or its comptroller were to be understood to mean payment by the Comptroller of the State of New York upon certification by the borough president of Manhattan, and approval both by the comptroller of the city and the Transit Commission.

This particular clause, it seems to us, was not intended to cast liability upon the State and to free the city entirely from initial payments. Its purpose was to harmonize the provisions of the act authorizing the municipality to accept State aid. It was tantamount to a covenant on the part of the city that in a proper case it would, through its officers, certify and approve proper payments to be made and that the State authorities would comply therewith. Here, in addition to disclaiming any liability on its part, the city resists plaintiff's claim upon the merits. If plaintiff's claims are well founded, the city has breached its covenant to certify and is, therefore, itself liable. (*Litchfield Const. Co.* v. *City of New York*, 244 N. Y. 251, 262 *et seq.*; *Rapid Transit Subway Const. Co.* v. *City of New York*, 259 id. 472, 479.)

Nor may reasonable argument against liability be predicated upon the provisions of section 149 of the Greater New York Charter, which provides in effect that no contract not to be paid by assessments upon property benefited shall be binding, unless the comptroller shall indorse his certificate that there is an unexpended and unapplied balance of an appropriation or fund applicable which will be sufficient to pay the estimated expense of carrying out the agreement. Here, as already stated, the form of the contract was approved by the Transit Commission. The acting president of the borough of Manhattan certified the estimated cost and stated that the same was chargeable to the " Grade Elimination — West Side Improvement Fund of the City of New York."

But even assuming that this was not the certification called for by the charter section, its provisions in our opinion have no application. The situation is controlled by the provisions of the special legislation authorizing the work — New York City Grade Crossing Elimination Act — as was held in analogous circumstances with respect to subway construction under the Rapid Transit Act. (*McGovern* v. *City of New York*, 185 App. Div. 609. See, also, *Lowe* v. *City of New York*, 240 id. 484; affd., 265 N. Y. 583.)

Plaintiff here was concerned under its contract only with the acts of the defendant city. Neither the State nor the railroad had any part in the work done by plaintiff. Its faithful performance

bond runs to the city. The contract provided that the city itself would have a right of action against a defaulting contractor. The form of the contract was approved by the corporation counsel and authorized and approved by resolutions of the board of estimate. Under the circumstances it seems to us that the city is the one to respond to plaintiff.

We are of opinion that on the appeal of the city, therefore, the judgment so far as it is in favor of plaintiff contractor should be affirmed. We agree with the trial justice in his holding that, save as otherwise allowed, item 2 of the damages as designated in the opinion was not shown to have sufficient causal relation to the breach claimed to justify a further allowance. We are further of opinion, however, that with respect to item 1, as above designated, plaintiff established a proper claim under the contract and that it was error to refuse compensation for the extra work occasioned by elimination of a drain called for by a contract of a third party in contemplation of which plaintiff's contract was made.

So, too, we are of opinion that the plaintiff established *prima facie* a claim under item 3 for assessment of damages, if any, occasioned by the fact that the city, contrary to the terms of the contract, compelled it to tunnel under a field house, rather than to proceed by open cut. But as to items 4 and 5, recovery was properly denied, we think, particularly in view of the exculpatory clauses in the contract.

It follows, therefore, that the judgment, in so far as it granted damages to the plaintiff on item 2 and denied recovery on items 4 and 5, should be affirmed, the action severed and the matter remitted to Trial Term for the assessment of damages, if any, with respect to items 1 and 3, with costs to the appellant.

MARTIN, P. J., TOWNLEY, GLENNON and UNTERMYER, JJ., concur.

Judgment, in so far as it granted damages to the plaintiff on item 2 and denied recovery on items 4 and 5, unanimously affirmed, the action severed and the matter remitted to Trial Term for the assessment of damages, if any, with respect to items 1 and 3, with costs to the appellant. Settle order on notice.